SPIVEY *v*. PUGH.

Opinion delivered October 27, 1919.

1. WITNESSES—ACTION AGAINST SECRETARY OF CORPORATION—ACTS OF DIRECTORS AND STOCKHOLDERS NOT TRANSACTIONS WITH DECEASED STOCKHOLDER.—The executrix of a deceased stockholder in a corporation sought to hold the secretary thereof liable *de son tort*, in assuming control of the property and managing the affairs of the corporation in the absence of the president. *Held*, evidence of the acts of the directors and stockholders, acting together as a body, was admissible and did not relate to transactions with the deceased stockholder (Kirby's Digest, section 3093), although the said deceased stockholder had attended the said meeting.

2. CORPORATIONS—ASSUMPTION OF CONTROL BY SECRETARY—BURDEN OF PROOF IN ACTION BY STOCKHOLDER.—Under the facts as set out above, the burden is upon the executrix to show that the secretary was guilty of some act of fraud in assuming control of the corporation, and in managing its affairs or the disposition of its assets; or of showing circumstances under which the law would impute to him some wrong or fraudulent conduct.

3. SAME—SAME—SAME.—Under the facts, the evidence *held* insufficient to show defendant, the secretary of the corporation, guilty of any wrong rendering him liable as an individual *de son tort* or as a trustee *ex maleficio.*

Appeal from Ashley Chancery Court; *Z. T. Wood,* Chancellor; affirmed.

*U. J. Cone,* for appellant.

1. The testimony of Spivey's personal attorney, George, as to matters that should be shown by the corporation records was incompetent under Kirby's Digest, §§ 3905, 3093.

2. Defendants have not competently shown the measure of good faith required of them as trustees of the corporate assets and they should be held responsible to the widow and administratrix of J. R. Spivey, deceased.

*Thos. Compere* and *Buzbee, Pugh & Harrison,* for appellees.

1. All the facts are presented to the chancellor do not appear in the transcript, hence the presumption is that the decree below is correct. 45 Ark. 240; 80 *Id.* 74.

2. Despite the law that a corporation can not sell its entire business and all its property except by consent of all the stockholders, if the only stockholder who is complaining was present and did consent to the sale, he is estopped and will not be heard. 91 Ark. 141.

3. Appellant prayed for an accounting and got it. She prayed for judgment for any balance due J. R. Spivey, and upon the testimony the court found that there was nothing due and dismissed her complaint for want of equity and the decree should be affirmed.

*G. P. George,* of counsel.

WOOD, J. The appellant, as executrix of the estate of her deceased husband, and D. E. Watson, and H. C. Wilcoxon, instituted this action in the chancery court of Ashley County, purporting to sue in their own rights and for the use and benefit of other stockholders, similarly situated, of the Jas. L. Pugh Manuf. Co., a domestic cor-

poration. They alleged that J. R. Spivey and Watson and Wilcoxson were stockholders. All the other stockholders were named defendants.

It was alleged that there was no organized board of directors; that the stockholders who were in charge and in control of the corporate affairs had wrongfully disposed of its assets and wrecked the corporation; that though regularly incorporated and all stock subscriptions paid, no certificates of stock had ever been issued; that there had never been a stockholders' or directors' meeting until just prior to the filing of the complaint herein, and after settlement had been demanded by the plaintiff; that plaintiffs were the minority stockholders and not able to get any settlement; that, soon after the incorporation, Jas. L. Pugh, who was then president and principal stockholder, had, on account of ill health, abandoned the affairs of the corporation and had ever since been absent from the State; that on the departure of said Pugh, his brother, Frank N. Pugh, without authority, wrongfully took charge of the business and took possession and control of all its assets and disposed of the same in such manner as to wreck the corporation; that Frank Pugh wrongfully converted the assets and working capital into money, receiving the sum of $13,264.12; that said Pugh wrongfully used the money thus received to pay the individual debts of Jas. L. Pugh, for which the corporation was not responsible and also other debts that were otherwise secured, and for which it was not necessary to use the assets of the corporation.

The appellants prayed for an accounting and for a judgment against Frank N. Pugh for the value of all the assets of the corporation at the time he took charge and for all deficits occasioned by his wrongful conversion of these assets and for the use and benefit of all the stockholders of the corporation that the business of the corporation be wound up and that the assets be distributed *pro rata* among them, and for all other and further general equitable relief.

The appellees answered, alleging that plaintiffs Watson and Wilcoxson had dismissed their complaint. The appellees, defendants below, further alleged that Jas. L. Pugh and J. R. Spivey, since deceased, were partners in 1913 and 1914, part of the time under the style of Jas. L. Pugh and part of the time as ''Pugh Box Company''; that during the partnership the said Pugh and Spivey borrowed from the Ashley County Bank $21,000, for which they were jointly and severally bound; that in the early part of 1914, the Ashley County Bank failed and its assets and liabilities were taken over by A. B. Banks & Co. That Banks & Co., and Pugh and Spivey took inventory of all assets of Pugh and Spivey, which amounted to the sum of $10,500; that A. B. Banks & Co. agreed with Pugh and Spivey to take over these assets and to release said Pugh and Spivey from their indebtedness to Ashley County Bank; that Pugh and Spivey were insolvent except as to the above named property mentioned and they decided to incorporate; that on March 11, 1914, steps were taken towards incorporation.

That Pugh and Spivey negotiated with the Farmers Savings Bank & Trust Company to pay to Banks & Co. the amount which it had advanced to them; that J. R. Spivey was present and assisted in the negotiations; that shortly thereafter Jas. L. Pugh, on account of ill-health, was compelled to abandon the business and leave the State; that at this time Pugh and Spivey and the Jas. L. Pugh Manuf. Co. had $5,352.74 worth of lumber, plant and equipment worth $4,000, and owed various and sundry debts amounting to $10,725; that Spivey was also in bad health and expecting to die at any time. That Jas. L. Pugh was at all times the general manager of the business; that at the time of his departure from the State the mill yard was full of green pine logs and there was quite a stock of green pine lumber on the yard; that Frank N. Pugh, for the accommodation and financial good of the parties interested and without compensation, operated said business to the extent of sawing up the logs

then on hand and properly stacking and caring for the lumber manufactured; that H. T. Benoit bid and offered the sum of $8,852.74 for the lumber, sawmill, box factory and all other assets of the Pugh Manuf. Co., which offer was submitted to a meeting at which J. R. Spivey, F. N. Pugh, F. H. Simpson and G. P. George were present and agreed to accept Benoit's offer.

Appellees further alleged that J. R. Spivey never at any time put any money in the firm of Pugh & Spivey or the Pugh Box Company, nor the Jas. L. Pugh Manufacturing Company; that the latter company was capitalized at $10,000; that Jas. L. Pugh owned the machinery, which he put in at $2,500, and that the machinery put in by J. R. Spivey was old and not worth $2,500; that the balance of the stock was paid in cash by other stockholders for their stock without any idea of realizing any profits therefrom, but contributed the amount of cash for the sole purpose of enabling the Jas. L. Pugh Manuf. Co. to keep going and to continue giving employment to the laboring people of the town; that Jas. L. Pugh and J. R. Spivey were insolvent before the incorporation and on account of the ill health of both, the corporation was wrecked, to the consequent loss of all who were financially interested therein.

The appellant replied, denying all the allegations of the answer and setting up that many of the items charged by Frank N. Pugh were payments of the personal indebtedness of Jas. L. Pugh, for which the corporation was not responsible. She further alleged that Jas. L. Pugh was the owner of a large tract of land from which Frank Pugh had cut and sold timber and converted the proceeds to his own use and that this land and the proceeds from this timber should be subjected to appellant's claim; she alleged that Frank Pugh be held as trustee of all the sums that had come into his hands as the pro ceeds of the property of Jas. L. Pugh.

Appellant prayed for the appointment of a master, who should take testimony and state an account of all the matters set forth in the pleadings and that on the

final hearing she be granted the relief for which she originally prayed.

It will be observed that, although the action was begun by the appellant, as executrix of the estate of her deceased husband and the other stockholders, against the appellee, Frank N. Pugh and other stockholders, alleging that those who were in charge of the Jas. L. Pugh Manuf. Co. had wrongfully disposed of all the assets of the corporation, the complaint further alleged that there had never been a stockholders' or directors' meeting until appellant had demanded a settlement of Frank N. Pugh.

There is an allegation that, shortly after the incorporation, Jas. L. Pugh had, without authority, assumed entire charge and control of the affairs of the corporation, but that because of ill health he had abandoned the business of the corporation and had left the State. There is no allegation that any of the other parties who were made defendants had assumed control and management of the affairs of the corporation, nor are there any allegations of fact sufficient to show a cause of action against any of the parties who were originally named defendants in the bill, except Frank N. Pugh.

It appears, therefore, from the allegations of the complaint and the reply to the answer of Frank N. Pugh *et al.,* the appellees, and the prayers of appellant's pleadings, that the action was one by the appellant against Frank N. Pugh, seeking to hold him liable *de son tort* in taking charge of the assets of the corporation and assuming control over and management of the business affairs of the corporation after Jas. L. Pugh had left the State.

Neither the complaint nor the reply are very definite in their allegations as to the specific acts constituting the wrongs of Frank N. Pugh of which appellant complains. In the original complaint the allegations are to the effect that he "wrongfully and without authority took charge, possession, and full control of all the business *et cetera,*  *  *  *  and undertook *de son tort* to

wind up the business affairs of the corporation so that a corporate wreck is all that now remains *et cetera.*" In the reply, the appellant alleges in substance that Jas. L. Pugh owned 280 acres of land which Frank N. Pugh had used for paying the private and personal debts of Jas. L. Pugh in order to hinder and delay the appellant in the collection of her claim, "that said Frank N. Pugh has cut and sold large quantities of timber from said land and wrongfully converted the money received and disposed of same in ways unknown to appellant *et cetera.*"

There was no demurrer to the complaint nor any motion to make the same more specific. The appellees, it seems, were contented merely to deny the allegations of the complaint.

The most that can be said of the pleadings, as we view them, is that they make an issue as to whether or not Frank N. Pugh is liable to the appellant as an individual *de son tort* in taking charge of and managing the business affairs of Jas. L. Pugh Manuf. Co., or whether or not treating him as a trustee of a constructive trust, he could be held *ex maleficio* in the conduct of the business of the corporation which he undertook to manage after the departure of his brother from the State.

Prior to the incorporation of the Jas. L. Pugh Manuf. Co., Jas. L. Pugh and J. R. Spivey had been operating a mill business in the town of Hamburg, called the Jas. L. Pugh Box Manuf. Co. It was not a corporation and just what the business relation was between Pugh and Spivey does not appear from the testimony, but at any rate it seems that they each owned a lot of saw mill machinery and they combined their efforts and their machinery and thus carried on the business.

It appears from the testimony that Jas. L. Pugh was indebted to the Ashley County Bank in the sum of $21,-270.29, and, according to the testimony for the appellant, this was a personal indebtedness of Jas. L. Pugh. But the testimony for the appellees tended to show that this indebtedness to the Ashley County Bank, while standing in the name of Jas. L. Pugh, was really the indebtedness of the Jas. L. Pugh Box Manuf. Co.

It appears that the Ashley County Bank failed, and its assets passed into the hands of A. B. Banks & Co., and J. H. Meeks. Banks & Co. and Meeks discovered that Jas. L. Pugh Box Manufacturing Co. was insolvent, and they agreed that the indebtedness of this company might be settled at fifty cents on the dollar. At this juncture, the Jas. L. Pugh Manufacturing Co. was organized.

One of the witnesses, G. P. George, explains how this organization was effected, as follows: "The business of Pugh and Spivey was at a standstill or practically so, and the laborers were discharged. Pugh and Spivey personally called on the business men of the town and asked these men to come into this company and make some arrangement by which employment could be given the laboring people of the town. A meeting was arranged at my office at which eight or ten business men met to discuss ways and means to start up this business for the good of the town. It was ascertained that the debt due the bank was more than $21,000, and it was decided at this meeting to offer a compromise of fifty cents on the dollar in settlement of the indebtedness due Banks & Co., and if this settlement could be made, they would incorporate under the name of Jas L. Pugh Manufacturing Co. and the business men took stock in the corporation. The corporation was organized and the settlement with Banks & Co. was effected. It was the understanding with everybody that, if any money was gotten out of this, the concern would have to make it with future operations. The price paid Banks & Co. was more than the actual value of all the property taken over. The business of the corporation was to have been run by Jas. L. Pugh and Spivey, who were each to draw a salary of $100 a month. In a short while after the corporation was formed, Jas. L. Pugh, it was discovered, had tuberculosis of the throat. He had to leave the State and had never returned, and J. R. Spivey had heart trouble and was never able to do anything and died within less than a year."

George further testified, "There being nobody to operate the mill with Pugh gone and Spivey sick, the

business was continued by Frank N. Pugh just long enough to saw the green logs on the yard and the timber on the tract of land belonging to the concern. It was decided to get rid of the assets of this corporation. All lumber and whatever else could be sold was sold and applied on the debts of the corporation, and the mill machinery was sold to Mr. Benoit for $4,000. This sale was made and closed at a meeting of the directors of the corporation. Present at that meeting were J. R. Spivey, myself, Frank Pugh and Frank Simpson, and I do not know who else was present. I do not think that Jas. L. Pugh or J. R. Spivey or myself ever got anything out of the stock we owned in the corporation, but some of the stockholders were paid personally by Frank Pugh. Whether Mr. Spivey was liable or not for the debt due the old Ashley County Bank I don't know, but he was interested in the business and received his share of the benefits and credits extended by the Ashley County Bank.''

The testimony of Frank N. Pugh corroborates the testimony of George. It is not necessary to set forth his testimony in detail. He states, in part, that he was the secretary and treasurer of the Jas. L. Pugh Manufacturing Co., and when Jas. L. Pugh left, he assumed charge and control of the business and managed it as best he could. He only expected his brother to be gone possibly a week and told him he would look after it until his return. Afterwards it was ascertained that his brother was in a serious condition, and he notified witness that he could not come back and requested witness to do whatever he thought best. Then, says the witness: ''I talked the matter over with the stockholders individually, not in a meeting, and we decided it was best to run the mill and saw what stock of logs there was on the yard and then to shut the mill down.'' Further along, he testified as to the debts of the corporation at the time it suspended business and exhibited a list of them. Witness was asked how these debts were paid and stated that the property belonging to the new corporation was sold and its debts paid out of the proceeds as far as it would go. He stated

that the sale was authorized by the directors of the corporation on June 25, 1914; that J. R. Spivey was vice-president, and was present and participated in the meeting at the time the sale was made; that the money received from the assets of the corporation was used in liquidating its debts.

It is unnecessary to pursue the subject further. The testimony of these witnesses was competent. Such testimony did not relate to transactions with or statements of J. R. Spivey, deceased, with Frank N. Pugh or the other parties defendants to the suit, but the testimony simply revealed what was the act of the directors and stockholders of the Jas. L. Pugh Manufacturing Co., acting as a body or organization and did not concern any individual acts of Spivey. The testimony of these witnesses does not come within the inhibition of section 3093 of Kirby's Digest.

The burden was upon the appellant under the issues as finally presented by the pleadings to show that the appellee was guilty of some positive act of fraud in assuming control and management of the affairs of the corporation after the illness of his brother, or some fraud in the management thereof, or in the disposition of the assets while he was temporarily in charge of the affairs of the corporation, or else to show circumstances under which the law would impute to him some wrongful or fraudulent conduct.

The trial court found that the appellant's complaint should be dismissed for want of equity. While it is manifest that the business affairs of the corporation were not managed in the manner contemplated by law, and that, upon the insolvency of the corporation, its business and assets were not disposed of as the statute in such case contemplates, yet the facts as revealed by the testimony would not justify the conclusion that Frank N. Pugh had done any wrong that would subject him to a liability as an individual *de son tort,* nor as trustee *ex maleficio.* See *Bragg* v. *Hartney,* 92 Ark. 59; 3 Pom. Eq. Jur. 2404, section 1053.

It must be borne in mind that the issue as finally made does not attempt to subject the directors of the corporation, as such, to any liability for the mismanagement of the affairs and the disposition of the assets of this insolvent corporation. If there could be any liability under the circumstances, the directors and stockholders, as such, alone are liable, and not Frank N. Pugh.

The decree is, therefore, correct and it is affirmed.